An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-559

Filed 15 April 2026

Burke County, Nos. 21JA000184-110, 21JA000185-110

IN RE: X.H. & A.H.

Appeal by respondent-parents from order entered 13 March 2025 by Judge Robert A. Mullinax, Jr., in Burke County District Court. Heard in the Court of Appeals 10 February 2026.

> *Joshua David Lee for petitioner-appellee Burke County Department of Social Services.*
>
> *N.C. Administrative Office of the Courts, by Michelle FormyDuval Lynch, for appellee guardian ad litem.*
>
> *No brief filed for the guardians.*
>
> *Jeffrey L. Miller for respondent-appellant mother.*
>
> *Micah Jones for respondent-appellant father.*

ZACHARY, Judge.

Respondent-Parents appeal from the trial court's permanency planning order which eliminated reunification from the permanent plan, ordered a sole plan of guardianship, and waived future review hearings. After careful review, we vacate the

trial court's order eliminating reunification from the juveniles' permanent plan and remand for further proceedings.

## I.  Background

On 6 December 2021, the Burke County Department of Social Services ("DSS") filed a petition seeking an adjudication that "Ann" and "Xeno"[1] were neglected and dependent juveniles. The petition alleged that the juveniles were neglected in that their "parent, guardian, custodian, or caretaker d[id] not provide proper care, supervision, or discipline" and "create[d] or allow[ed] to be created a living environment that [wa]s injurious to the juvenile[s'] welfare." In addition, the petition alleged that the juveniles were dependent in that their "parent, guardian, or custodian [wa]s unable to provide for the juvenile[s'] care or supervision and lack[ed] an appropriate alternative child care arrangement."

Ann was born in May 2018 and Xeno was born in November 2021.[2] According to the petition, on 21 November 2021, DSS received a Child Protective Services ("CPS") report that Respondent-Mother had tested "positive for THC and . . . had 6 positive drug screens throughout her pregnancy." Xeno was "in the Special Care Nursery due to being 3 pounds at birth and [wa]s diagnosed with Intrauterine Growth Restrictions." Respondent-Mother "reported she had smoked four (4) days before

---

[1] We employ the pseudonyms to which the parties stipulated to protect the identities of the juveniles. *See* N.C.R. App. P. 42(b).

[2] Respondent-Father is the biological father of Xeno. Ann's biological father did not appeal the trial court's order; consequently, he is not a party to this appeal.

admission to the hospital and it had been over a month since she ha[d] used methamphetamine." She "appeared to not want to visit [Xeno]."

The petition also alleged that a caseworker met with Respondent-Parents on 22 November 2021 and at that time, Xeno "had been transferred to [Catawba Valley Medical Center] Newborn Intensive Care Unit." Respondent-Mother "reported she smoked marijuana 5 days before giving birth and had smoked methamphetamine throughout her pregnancy but had quit smoking methamphetamine 2 months before giving birth." Respondent-Father "reported he smoked marijuana daily outside of the home away from the children." Respondent-Parents each submitted to a hair follicle drug screen, which were both positive for "amphetamines, cannabinoids, THC, and methamphetamines." Respondent-Parents were asked to identify "temporary safety placements" for the juveniles; however, DSS determined that each potential placement was inappropriate due to "concerning criminal or CPS history, the conditions of their home, or report[s] they could not assist in caring for the children."

On 6 December 2021, the trial court granted nonsecure custody of the juveniles to DSS. On 16 December 2021, the court entered an amended order continuing nonsecure custody of the juveniles with DSS and on 13 January 2022, entered an additional order continuing nonsecure custody with DSS.

The trial court conducted a pre-adjudication hearing on 6 January 2022 and an adjudication and disposition hearing on 20 January 2022 and 3 February 2022. The court adjudicated the juveniles as neglected and dependent as defined in N.C.

Gen. Stat. §§ 7B-101(9) and (15) (2023).[3] The court ordered DSS to maintain custody of the juveniles and arrange for their "placement or foster care."

The trial court conducted a series of permanency planning hearings from 28 April 2022 to 16 January 2025.

In an order entered on 26 May 2022, following the first permanency planning hearing, the court ordered that each Respondent-Parent "enter into and comply with a case plan and complete the following services":

> a. Complete a substance abuse assessment, follow all recommendations, and sign records release for [DSS].
>
> b. Submit to random drug screening via hair follicle and urine testing.
>
> c. Complete [a] parenting education program approved by [DSS].
>
> d. Obtain and maintain safe and stable housing and provide documentation to [DSS].
>
> e. Obtain and maintain legal and verifiable employment and provide documentation to [DSS].
>
> f. Refrain from engaging in criminal activity or any illegal drug use.

Following each review hearing, the court entered an order containing

---

[3] The trial court's final order was entered on 13 March 2025; on 19 June 2025, the North Carolina General Assembly passed H.B. 612, which amended certain portions of the juvenile code, including subsections applicable to the instant case. H.B. 612, 2025 Gen. Assemb., First Sess. (N.C. 2025). Citations to the juvenile code in this opinion are to the version in effect at the time of the entry of the final order.

essentially the same findings and conclusions as the previous orders. In its first order, the court found that Respondent-Parents were "making adequate progress toward reunification within a reasonable period of time"; in almost every order entered thereafter, the court found that Respondent-Parents were making "slow progress" or "progress" toward reunification within a reasonable period of time.[4] Additionally, in each order entered after the first permanency planning hearing until the order entered on 19 December 2024, the court set reunification as the primary permanent plan with adoption as the secondary plan.

The court also provided for Respondent-Parents to have limited visitation with the juveniles. In its order entered after the third review hearing, the court suspended Respondent-Father's visitation with Ann due to disclosures that Ann made that raised suspicions of abuse by Respondent-Father during visitation. In its order entered after the fourth permanency planning hearing, the court ordered that "[v]isitation between [Respondent-Father] and [Ann] shall continue to be suspended until a forensic interview with [Ann] can be completed." Ultimately, it was determined that Respondent-Father was not abusing Ann. Thus, in the order entered following the fifth permanency planning hearing, Respondent-Father was permitted to resume visitation with Ann.

Following a permanency planning hearing on 31 August 2023, the court

---

[4] The court did not make a similar finding in its order entered on 18 January 2024.

entered an order requiring Respondent-Parents to "comply with the recommendations from their Parenting Capacity Assessments and show a benefit from the parenting skills that they have learned."

On 19 December 2024, the court entered an order finding that Respondent-Parents were "making minimal progress toward reunification within a reasonable period of time" and changed the primary permanent plan to guardianship "with a secondary [permanent] plan of reunification."

On 16 January 2025, the court conducted its final review hearing. In its order entered on 13 March 2025, the court again found, *inter alia*, that Respondent-Parents were making "minimal progress" on their case plans and that it was "unlikely that reunification could occur within the next six months as [Respondent-Parents] have not corrected the conditions that led to the removal of the juveniles from the home." The court relieved DSS of further reunification efforts, eliminated reunification from the permanent plan, changed the permanent plan to guardianship, waived further review hearings, terminated DSS custody, and granted guardianship of the juveniles to the appointed guardians. In addition, the court granted Respondent-Parents limited weekly visitation.

Respondent-Parents filed timely notice of appeal from this order in accordance

with N.C. Gen. Stat. § 7B-1001(a)(4).[5]

## II.    Appellate Jurisdiction

On 2 August 2025, Respondent-Mother filed a petition for writ of certiorari due to her "technical failure to comply with a non-jurisdictional matter." The "technical failure" was Respondent-Parents' lack of service of the proposed record on appeal on the guardians in violation of N.C.R. App. P. 3.1(d), which provides:

> The parties may settle the record on appeal by agreement at any time before the record on appeal is settled by any other procedure described in this subsection.
>
> Absent agreement, the appellant must serve a proposed record on appeal on each party to the appeal within fifteen days after delivery of the transcript.

According to the petition, the proposed record "was duly settled by all counsel of record and docketed with this Court on 13 June 2025." "[T]he guardians were not served with the proposed record and did not participate in the settlement of the record prior to its filing and docketing with this Court"; however, they "were served with a copy of the settled record on 17 July 2025 and a Certificate of such service was filed in this appeal on the same date." Additionally, Respondent-Parents' notice of appeal "was properly served on the guardians."

Here, the guardians had actual notice of the appeal, the guardians have not

---

[5] "In a juvenile matter . . . only the following final order[ ] may be appealed directly to the Court of Appeals: . . . Any order, other than a nonsecure custody order, that changes legal custody of a juvenile." N.C. Gen. Stat. § 7B-1001(a)(4).

raised any issue before this Court regarding service of the proposed record, and there is no indication that any party was prejudiced by the circumstances of the settlement and service of the record on appeal. *See In re A.N.B.*, 290 N.C. App. 151, 162, 891 S.E.2d 647, 656 (2023) (concluding that failure to serve in accordance with N.C.R. App. P. 3.1 was "non-jurisdictional" and was "not a substantial or gross violation of the appellate rules" (citation omitted)).

Therefore, we dismiss Respondent-Mother's petition for writ of certiorari as moot and proceed to address the merits of Respondent-Parents' appeal.

**III.    Discussion**

Chapter 7B of our General Statutes governs abuse, neglect, and dependency actions. As relevant to the case before us, "[w]hen . . . the court removes custody of the juvenile from a parent, guardian, or custodian at the initial disposition hearing, the statutory provisions regarding permanency planning apply." *In re J.M.*, 384 N.C. 584, 593, 887 S.E.2d 823, 829 (2023). The court is then statutorily required to hold "a permanency planning hearing within ninety days of the initial disposition hearing and, in general, follow-up permanency planning hearings at least every six months as long as it retains jurisdiction over the matter. The permanent plan adopted by the court must contain a primary plan and a secondary plan." *Id.*; *see* N.C. Gen. Stat. § 7B-906.2(b).

Reunification must be the primary or secondary plan unless:

> (1) the court made written findings specified in [N.C. Gen.

Stat.] § 7B-901(c) at the initial disposition hearing; (2) the court made written findings described in [N.C. Gen. Stat.] § 7B-906.1(d)(3) at a review hearing or an earlier permanency planning hearing; (3) the permanent plan has been achieved; or (4) the court makes written findings that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety.

*J.M.*, 384 N.C. at 594, 887 S.E.2d at 830 (cleaned up) (citing N.C. Gen. Stat. § 7B-906.2(b)).

In the instant case, the trial court eliminated reunification from the permanent plan after determining that Respondent-Parents were "acting in a manner inconsistent with the health or safety of the juvenile[s]." In sum, the court found that Respondent-Parents had an unstable housing situation; that there had been cigarette smoking in Xeno's presence in violation of the trial court's order; that Respondent-Mother permitted her mother to reside at Respondent-Mother's home, against DSS directives; and that Respondent-Father's capacity to parent without supervision may be inadequate "due to his memory loss" following a work-related injury.

Respondent-Parents contend that they have successfully completed their case plans and there is no evidence to support the court's finding that they are "acting in a manner inconsistent with the health or safety of the juvenile[s]." Respondent-Mother argues, with regard to Ann and Xeno, that (1) "[t]he trial court erred in eliminating reunification and granting guardianship," and (2) she "received ineffective assistance of counsel." In support of her first argument, Respondent-Mother asserts that the court failed "to comply with [statutory] requirements for

findings and conclusions" and challenges several of the court's findings and conclusions.

Similarly, with regard to Xeno, Respondent-Father challenges the trial court's elimination of reunification from the permanent plan through two issues he raises on appeal: (1) that "[f]indings necessary to the trial court's conclusions were either not supported by the record or illogical," and (2) "[e]ven with the challenged findings, the trial court's conclusions were not supported by the findings." Respondent-Father further contends that "[t]he trial court failed to evaluate whether reunification was futile; accordingly, the only justification for eliminating reunification under [N.C. Gen. Stat. §] 7B-906.2(b) was the achievement of guardianship, and the required analysis in [N.C. Gen. Stat. §] 7B-906.1(d)(3) was not performed." He also argues that the court erred by waiving further review hearings without noting the standard of proof.

### A. Standard of Review

Our review of a permanency planning order is limited to "whether there is competent evidence in the record to support the findings of fact and whether the findings support the conclusions of law. Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding." *Id.* at 591, 887 S.E.2d at 828 (cleaned up). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence. Uncontested findings of fact are likewise binding on appeal." *Id.* (citation omitted). We review the "trial court's conclusions of

law . . . de novo." *In re J.T.*, 252 N.C. App. 19, 20, 796 S.E.2d 534, 536 (2017) (cleaned up).

"The trial court's dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion." *In re A.P.W.*, 378 N.C. 405, 410, 861 S.E.2d 819, 825–26 (2021). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re J.H.*, 373 N.C. 264, 268, 837 S.E.2d 847, 850 (2020) (citation omitted).

## B. Challenged Findings of Fact and Ultimate Findings of Fact

Respondent-Parents challenge several of the trial court's findings of fact and ultimate findings of fact. The findings that are not specifically challenged by either of the parents "are deemed to be supported by competent evidence and are binding on appeal." *In re L.R.L.B.*, 377 N.C. 311, 316, 857 S.E.2d 105, 111 (2021).

### 1. Findings of Fact

Respondent-Mother challenges Findings #32 and #61–62[6] as "unsupported by the evidence." Meanwhile, Respondent-Father challenges Findings #43, #47, and #61–62 as "either not supported by the record or illogical."

*Finding #32*

---

[6] On page 12 of the order on appeal, Finding #72 is immediately followed by Finding #26. As such, Findings #26–46, which follow Finding #72, are misnumbered. To avoid confusion, we will refer to the misnumbered findings according to the numbers assigned them by the trial court, as do the parties.

- 11 -

Finding #32 states: "The juveniles have been in care approximately 1,052 days and [Respondent-Parents] know and have known that their home is required to be safe for children if they are to be reunified with the juveniles. This [c]ourt ordered that [Respondent-Parents] obtain new housing [in] 2023." Respondent-Mother claims that "[t]he trial court never ordered [Respondent-Parents] to obtain new housing." However, the guardian ad litem ("GAL") responds that, as Respondent-Mother admits, "the court did order DSS to help the family find housing that would better meet their needs in April 2024."

In its order entered on 11 April 2024, following the eighth review hearing, the trial court directed DSS to "assist [Respondent-Parents] in obtaining different housing that would better meet the needs of their family." Additionally, the trial court ordered Respondent-Parents to enter into case plans, each of which included as a condition: "Obtain and maintain safe and stable housing and provide documentation to [DSS]."

Therefore, Finding #32 is supported by competent evidence.

*Findings #43 and #47*

Respondent-Father challenges a portion of Finding #43, as follows: "[Respondent-Father] has been under the care of a physician since the accident occurred."[7] Respondent-Father asserts that he "was only 'under the care of a

---

[7] Respondent-Father was injured in a work-related accident.

physician' . . . in the sense that anyone who sees a doctor is 'under their care.' "

He also challenges Finding #47:

> [Respondent-Father]'s addendum to his parenting capacity evaluation that was ordered at a prior court hearing was completed in March 2024. The recommendations stated that [Respondent-Father] would have difficulties parenting the children long term due to his memory loss. It was recommended that he not be left alone with the children due to this concern. Further, [Respondent-Father] has been diagnosed with a form of cancer and is in treatment.

Concerning Finding #43, a DSS permanency planning report stated that Respondent-Father had confirmed "that his cancer [wa]s now in remission; however, he does still struggle with his TBI and reports not being cleared to return to work." The GAL permanency planning report stated that Respondent-Father "ha[d] been battling cancer, but it [wa]s the understanding of the GAL he has been deemed cancer free."

The trial court's findings as they pertain to Respondent-Father having had cancer and remaining under treatment for injuries suffered in a work-related accident are supported by competent evidence. Moreover, as the GAL points out, "[t]he order does not indicate that [Respondent-Father]'s cancer was an issue of concern" and therefore, these findings, "if in error, do[ not] appear to have influenced the court's ultimate ruling in this case" and "do[ ] not warrant reversal."

As to Finding #47, Respondent-Father contends that it was "a description of evidence—not a finding." He posits that "[a] finding would assert, from the trial

court's point of view, that '[Respondent-]Father *will* have difficulties parenting long-term due to memory loss,' etc. That boldness should be required of trial courts to test their actual confidence in the evidence." Indeed, this is not a finding that Respondent-Father will have difficulty in parenting the children and should not be permitted to care for them without assistance.

Finding #43 is supported by the evidence. However, Finding #47 is not supported by the evidence and we disregard this finding.

*Findings #61–62*

Both Respondent-Parents challenge a portion of Finding #61 and all of Finding #62.

Finding #61 states: "Housing continues to be an issue for all parents and visits continue to occur with unauthorized people and in unauthorized places. There continues to be issues and concerns about [Respondent-Mother]'s willingness to comply with [DSS]'s recommendations and [Respondent-Father]'s parenting capacity."

Respondent-Parents challenge the first portion of Finding #61—that "[h]ousing continues to be an issue for all parents"—and do not challenge the remainder of the finding. Finding #62 consists of the following: "[Respondent-Parents'] housing situation is unstable at best."

In the GAL report, which was provided to the trial court before the final permanency planning hearing, the GAL noted the following regarding Respondent-

Parents' housing:

> This GAL has been expressing concern over the space and overall condition of [Respondent-Parents'] home for over **TWO YEARS.** As far as the GAL can recall, concern over housing has been included in **EVERY** GAL Court Report over this time period. This GAL has discussed this concern with [Respondent-Parents] a[d] nause[a]m. They have had more than ample time to address this issue. Yet, they still reside in the same residence.
>
> It is the understanding of the GAL on 12/9/24 [Respondent-Parents] provided documentation of new housing they have secured. According to what was shared with the GAL this particular housing was not available until January 2025. While the GAL commends them for finally making progress on this front, there is concern from both [DSS] and [the] GAL that they won't be able to maintain this due to the increased financial commitment.

Additionally, during the permanency planning hearing, a CPS case worker testified that the concern regarding housing was "the sustainability of it" based upon Respondent-Parents' ability to pay the rent.

However, we note that DSS had approved the new house and in its prehearing report, created on 13 January 2025, DSS indicated that housing, *inter alia*, was: "Achieved." This report was incorporated into the court's order, which was entered on 13 March 2025. Moreover, at the time of the hearing, Respondent-Mother had full-time employment of which DSS was aware; DSS had "adequate confirmation" that Respondent-Father had "been approved for disability" in the amount of $1,600 per month; and DSS had confirmed that Respondent-Parents would be "receiving financial assistance through the HOP program" once the home was inspected. When

asked on cross examination whether "housing was a major issue," the CPS worker responded: "It was *prior*. Yes." (Emphasis added).

Respondent-Father points out that Finding #62 and the portion of Finding #61 that he challenges were based on the "presumption [Respondent-Parents] would miss rent before the next hearing was due." We agree. These findings would require Respondent-Parents to prove a negative, which "the law generally does not require . . . ." *In re M.T.*, 285 N.C. App. 305, 339, 877 S.E.2d 732, 755 (2022) (cleaned up).

Accordingly, we conclude that Finding #62 and the challenged portion of Finding #61 regarding housing are unsupported by the evidence and we will disregard these erroneous findings.

### 2. Ultimate Findings of Fact

Respondent-Mother challenges Findings #28–29, #32, and #41. Respondent-Father challenges Findings #30 and #32.

"Ultimate facts are the final resulting effect reached by processes of logical reasoning from the evidentiary facts." *In re H.P.*, 278 N.C. App. 195, 202, 862 S.E.2d 858, 866 (2021) (citation omitted).

Finding #28 is properly characterized as an ultimate finding of fact in part and a conclusion of law in part. The remainder are properly identified as ultimate findings of fact.

*Finding #28*

Respondent-Mother challenges Finding #28, which provides in part: "The

juveniles need more adequate care and supervision and need placement outside of the home. . . . No other reasonable means were available to protect the juveniles other than out of home placement."

Our review of the trial court's order reveals no evidentiary facts that "reasonably support the trial court's ultimate finding of fact" which Respondent-Mother challenges. *In re G.C.*, 384 N.C. 62, 65, 884 S.E.2d 658, 661 (2023) (cleaned up). Therefore, these portions of Finding #28 are not supported by the findings of fact and will be disregarded.

*Findings #29–30*

Respondent-Parents challenge the court's determination that they both were "making minimal progress toward reunification within a reasonable period of time; [were] minimally participating in or cooperating with the plan, [DSS], and the [GAL] for the juveniles; and [were] acting in a manner inconsistent with the health or safety of the juvenile[s]."

Respondent-Mother asserts that Finding #29 is "not supported by other evidentiary findings or the history showing [Respondent-]Mother's actual progress in all substantial matters related to each child." She contends that previous DSS reports and trial court orders had "found [her] participating in DSS meetings and to be making progress, responsive to every issue raised with her." Respondent-Father, meanwhile, argues that Finding #30 "was not the product of logical reason."

Respondent-Parents advance arguments that reflect the progress with their

case plans and toward reunification. We agree that each Respondent-Parent has made progress. We further conclude that "the trial court's findings are not sufficiently specific to allow this Court to determine what evidence the trial court relied on in reaching this ultimate finding." *In re I.K.*, 260 N.C. App. 547, 553, 818 S.E.2d 359, 363 (2018) ("The trial court found that Respondent[-Parents'] compliance with their case plans had improved . . . and did not make any findings as to Respondent[-Parents'] conduct since that time that could demonstrate that Respondent[-Parents] were making minimal or insufficient progress."). The court did incorporate the DSS and GAL court reports which were submitted before the hearing and reflected concerns. The GAL report identified three "main issues/concerns that continue to be present": (1) housing (which appears to have been resolved by the 16 January 2025 hearing); (2) the smell of cigarette smoke on the children; and (3) the children had been left alone with Respondent-Father in contravention of the parental capacity evaluation recommendation. The DSS report reflected that large portions of Respondent-Parents' case plans had been "achieved"; the only areas to not receive this designation were random drug screens for Respondent-Parents which were "ongoing," parenting education for Respondent-Father which was "partially achieved," and housing, employment, and transportation for Respondent-Mother which was "partially achieved."[8] (Capitalization omitted). Nonetheless, the court's

---

[8] We note that the category of "housing, employment, and transportation" was marked "achieved" for Respondent-Father. (Capitalization omitted).

order contained findings that Respondent-Parents had complied with various aspects of their case plans and did not contain findings of areas in which they had failed to comply. "Thus, the order itself does not make findings sufficient to demonstrate what the trial court looked to in determining that Respondent[-Parents] had made minimal progress toward reunification." *Id.*

Moreover, the final portions of these ultimate findings—that each Respondent-Parent was "acting in a manner inconsistent with the health or safety of the juvenile[s]"—are not supported by the evidence. In previous orders, the court had noted concerns with cigarette smoke in the home and around the children as well as "roach infestations" and "a rodent problem." In the order on appeal, the court noted previous issues with smoking around the children and extermination needs but made no findings regarding an *existing* problem of smoking around the children or extermination needs in Respondent-Parents' new home. Neither did the court make any findings that would support a determination that either Respondent-Parent was acting "in a manner inconsistent with the health or safety of the juvenile[s]." Accordingly, these portions of the trial court's ultimate findings are unsupported by the evidentiary findings of fact and we will disregard them.

*Finding #32*

Both Respondent-Parents challenge this ultimate finding: "It is not possible for the children to be returned home and it is unlikely that reunification could occur within the next six months as [Respondent-Parents] have not corrected the conditions

that led to the removal of the juveniles from the home." Respondent-Mother asserts that the "sole condition" that led to the removal of the juveniles from the home was substance abuse and that this condition had been corrected. Similarly, Respondent-Father contends that "[t]he conditions leading to removal related to substance use, almost entirely" and that substance use was not a concern "by the second or third hearing."

Respondent-Mother points to Finding #27 as support; this finding details her submission to over three dozen drug screenings between 8 February 2022 and 26 December 2024, all of which returned negative results. Likewise, Respondent-Father points to Findings #41–42; Finding #41 lists over 30 drug screenings from 3 February 2023 to 16 December 2024, all of which returned negative results, barring medications for which Respondent-Father had verified prescriptions (Finding #42). The GAL does not address substance abuse as a condition which led to the removal of the juveniles but focuses its argument on housing.

Our General Statutes allow "the trial court to order a parent to take appropriate steps in order to achieve reunification." *In re S.G.*, 268 N.C. App. 360, 368, 835 S.E.2d 479, 486 (2019) (cleaned up); *see* N.C. Gen. Stat. § 7B-904(d1)(3). "For a court to properly exercise the authority permitted by this provision, there must be a nexus between the step ordered by the court and a condition that is found or alleged to have led to or contributed to the adjudication." *S.G.*, 268 N.C. App. at 368, 835 S.E.2d at 486 (citation omitted). "However, the trial court is not limited to ordering

services which directly address the reasons for the children's removal from a parent's custody." *Id.* "It may also order services which could aid in both understanding and resolving the possible underlying causes of the actions that contributed to the trial court's removal decision." *Id.* (cleaned up).

Accordingly, while substance abuse was a condition that led to the removal of the juveniles from the home, Respondent-Parents are incorrect to the extent that they contend that this was the *only* condition which led to the juveniles' removal. A review of the record confirms that both substance abuse and unsuitable housing were conditions which led to the removal of Ann and Xeno from Respondent-Parents' home.

Based on Findings #26–27 and #40–42[9], as well as other evidence in the record, we conclude that Respondent-Parents had corrected their substance abuse issues and the court erred in finding otherwise. Moreover, as stated above, Respondent-Parents had obtained suitable housing and the trial court erred in finding that this condition had not been corrected. Thus, Finding #32 is unsupported by the evidentiary findings and we will disregard it.

*Finding #41*

Respondent-Mother challenges the following ultimate finding: "The [c]ourt finds by clear, cogent, and convincing evidence that [Respondent-Parents] have acted inconsistently with their constitutionally protected rights as . . . parents."

---

[9] Findings #26 and #40 note that each Respondent-Parent had completed substance abuse classes and presented certificates of completion to DSS.

Respondent-Mother contends that this conclusion is "unsupported by the evidence and by the other findings in the [o]rder." However, we conclude that this challenge was not preserved for appellate review.

"Parents have a constitutionally protected right to the custody, care and control of their child, absent a showing of unfitness to care for the child." *In re R.P.*, 252 N.C. App. 301, 304, 798 S.E.2d 428, 430 (2017) (cleaned up). "A parent may lose the constitutionally protected paramount right to child custody if the parent's conduct is inconsistent with this presumption or if the parent fails to shoulder the responsibilities that are attendant to raising a child." *Id.* (cleaned up).

Our Supreme Court has recently held that "this constitutional claim must be preserved for appellate review like any other." *In re K.C.*, 386 N.C. 690, 691, 909 S.E.2d 170, 172 (2024). Indeed, "[i]f a parent does not raise this constitutional claim, the opposing parties will not have notice that they must present evidence to rebut it—evidence that, by its nature, may be different from what is needed to satisfy the statutory criteria in the Juvenile Code." *Id.* at 692, 909 S.E.2d at 172. To preserve this constitutional claim, "a parent must inform the trial court and the opposing parties that the parent is asserting a challenge *on constitutional grounds* and articulate the basis for that constitutional claim. If the parent fails to do so, the claim cannot be reviewed on appeal." *Id.* at 691, 909 S.E.2d at 172 (citation omitted).

"Moreover, because of this need to provide notice to the opposing parties, the preservation requirement applies even if the trial court addresses the constitutional

claim on its own initiative in its order." *Id.* at 698, 909 S.E.2d at 176. "A trial court's findings are limited to evidence in the record. Without notice that the parent is asserting a constitutional claim, the opposing parties will not know that they must present evidence that would support the necessary findings to reject the claim." *Id.* (citation omitted).

Our review of the transcript and record reveals that Respondent-Mother failed to assert a challenge on constitutional grounds and thus, this challenge was not preserved for appellate review.

### C. Elimination of Reunification as a Plan

Respondent-Mother argues that "[t]he evidence and the trial court's findings were insufficient to eliminate reunification and grant guardianship." Respondent-Father also challenges the trial court's elimination of reunification from the permanent plan, asserting that "[t]he trial court failed to evaluate whether reunification was futile" and "the required analysis in [N.C. Gen. Stat. §] 7B-906.1(d)(3) was not performed."

During an adjudicatory hearing, the trial court adjudicates "the existence or nonexistence of any of the conditions alleged in a [juvenile] petition": that the juvenile is either "abused, neglected, or dependent." N.C. Gen. Stat. §§ 7B-802, -805. "If the court adjudicates the juvenile abused, neglected, or dependent, proceedings move to the dispositional phase, the purpose of which 'is to design an appropriate plan to meet the needs of the juvenile and to achieve the objectives of the State in exercising

jurisdiction.' " *J.M.*, 384 N.C. at 592, 887 S.E.2d at 829 (quoting N.C. Gen. Stat. § 7B-900).

During the disposition stage, the trial court conducts permanency planning hearings, at each of which "the court shall adopt one or more . . . permanent plans." N.C. Gen. Stat. § 7B-906.2(a). The permanent plans may include, *inter alia*: "(1) Reunification as defined by [N.C. Gen. Stat. §] 7B-101"; "(2) Adoption under Article 3 of Chapter 48 of the General Statutes"; or "(3) Guardianship pursuant to [N.C. Gen. Stat. §] 7B-600(b)." *Id.* § 7B-906.2(a)(1)–(3). "At any permanency planning hearing where the juvenile is not placed with a parent," the trial court must consider certain criteria and make written findings as to any that are relevant, including "[w]hether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests." *Id.* § 7B-906.1(e)(1). "[T]he trial court's consideration of whether it is possible for the juvenile to be placed with a parent within the next six months" may be "inferred from the findings." *In re L.L.*, 386 N.C. 706, 714, 909 S.E.2d 151, 158 (2024).

"Concurrent planning shall continue until (i) a permanent plan is or has been achieved or (ii) reunification is not identified as a permanent plan as provided for in subsection (b) of this section." N.C. Gen. Stat. § 7B-906.2(a1). Subsection (b) provides:

> Reunification shall be a primary or secondary plan unless . . . the permanent plan is or has been achieved, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. The finding that reunification

efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety may be made at any permanency planning hearing, and if made, shall eliminate reunification as a plan.

*Id.* § 7B-906.2(b).

At a permanency planning hearing where reunification is eliminated as a permanent plan, the trial court

> shall make written findings as to each of the following, which shall demonstrate the degree of success or failure toward reunification:
>
> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B-906.2(d).

"While use of the actual statutory language is the best practice, [N.C. Gen. Stat. § 7B-906.2(d)] does not demand a verbatim recitation of its language." *In re H.A.J.*, 377 N.C. 43, 49, 855 S.E.2d 464, 469 (2021) (cleaned up). "Instead, the order must make clear that the trial court considered the evidence in light of whether reunification would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *Id.*

at 49, 855 S.E.2d at 470 (cleaned up).

Here, the trial court found that each Respondent-Parent was

> making minimal progress toward reunification within a
> reasonable period of time; [wa]s minimally participating in
> or cooperating with the plan, [DSS], and the [GAL] for the
> juveniles; remain[ed] available to the [c]ourt, [DSS], and
> the [GAL] for the juveniles; and [wa]s acting in a manner
> inconsistent with the health or safety of the juvenile[s].

The trial court eliminated reunification from the permanent plan after concluding that it was "in the juveniles' best interests to have a sole plan of guardianship" and that it was not "in the juveniles' best interests and contrary to their welfare to return home as . . . [Respondent-Parents] need[ed] to engage in case plan services to alleviate the conditions which led to removal of the juveniles from the home."

The court then ordered Respondent-Parents to "comply with a case plan and complete the following services":

> a.    Complete a substance abuse assessment, follow all
> recommendations, and sign records release for [DSS].
> b.    Submit to random drug screening via hair follicle
> and urine testing.
> c.    Complete parenting education program approved by
> [DSS].
> d.    Obtain and maintain safe and stable housing and
> provide documentation to [DSS].
> e.    Obtain and maintain legal and verifiable
> employment and provide documentation to [DSS].
> f.    Refrain from engaging in criminal activity or any
> illegal drug use.

It is clear that the court considered each of the Section 906.2(d) factors.

However, some of these findings are not supported by evidentiary findings. For example, the court made no finding to support its ultimate finding that Respondent-Parents were "minimally participating in or cooperating with the plan" with the exception of the finding that they had unstable housing, for which there was not competent evidence. Indeed, Respondent-Parents had completed each item on their case plans. And although there had been an earlier problem with smoking in the presence of Xeno, that problem had been eliminated prior to this hearing. Accordingly, there was no evidence to support the court's ultimate finding and conclusion that Respondent-Parents, at the time of the hearing, were "acting in a manner inconsistent with the health or safety of the juvenile[s]" or that further reunification efforts were clearly futile at the time of the final review hearing.

It was therefore error for the trial court to eliminate reunification from the permanent plan. We vacate the court's order eliminating reunification from the permanent plan and remand for the court to resume the permanency planning review process.

### D. Waiving Future Review Hearings

Respondent-Father asserts that "[b]efore a trial court ceases further regularly scheduled permanency planning hearings, it must make all the findings enumerated in N.C. Gen. Stat. § 7B-906.1(n)" and contends that "[t]he ultimate findings and conclusions required by [this subsection] were either not made or not made by the proper standard of proof." "As we have already determined that the order[ ] granting

guardianship . . . must be vacated for the reasons noted above and are remanding this case, further review hearings will be necessary." *In re P.A.*, 241 N.C. App. 53, 65, 772 S.E.2d 240, 248 (2015). In that this issue may arise on remand, "we will address it in order to provide guidance to the trial court." *Id.*

N.C. Gen. Stat. § 7B-906.1(n) provides that a trial court may waive future review hearings if it "finds by clear, cogent, and convincing evidence each of the following":

> (1)    The juvenile has resided in the placement for a period of at least one year or the juvenile has resided in the placement for at least six consecutive months and the court enters a consent order pursuant to [N.C. Gen. Stat. §] 7B-801(b1).
> (2)    The placement is stable and continuation of the placement is in the juvenile's best interests.
> (3)    Neither the juvenile's best interests nor the rights of any party require that permanency planning hearings be held every six months.
> (4)    All parties are aware that the matter may be brought before the court for review at any time by the filing of a motion for review or on the court's own motion.
> (5)    The court order has designated the relative or other suitable person as the juvenile's permanent custodian or guardian of the person.

"The trial court must make written findings of fact satisfying each of the enumerated criteria listed in N.C. Gen. Stat. § 7B-906.1(n), and its failure to do so constitutes reversible error." *P.A.*, 241 N.C. App. at 66, 772 S.E.2d at 249. In addition, the best practice is for a court to affirmatively recite the applicable standard of proof in its order. *In re E.M.*, 249 N.C. App. 44, 56, 790 S.E.2d 863, 873 (2016). Nonetheless,

the failure to do so may not constitute prejudicial error where the record "viewed in its entirety clearly reveals that the court applied the proper evidentiary standard," *id.* (citation omitted), or where the court states the appropriate standard of proof in open court, *In re M.D., N.D.*, 200 N.C. App. 35, 39, 682 S.E.2d 780, 783 (2009).

Here, the trial court made the following findings:

> 36. [The juveniles] have resided with [the guardians] for more than one (1) year, so a review hearing is not necessary.
>
> 37. [The juveniles'] placement with [the guardians] is stable, and continuation of that placement is in the juveniles' best interests.
>
> 38. The parties are aware that the matter may be brought before the court for review at any time by the filing of a motion for review or on the [c]ourt's own motion.

The court also designated the appointed guardians to assume guardianship of Xeno and Ann. However, the court neglected to find that "[n]either the juvenile's best interests nor the rights of any party require that permanency planning hearings be held every six months" in accordance with N.C. Gen. Stat. § 7B-906.1(n)(3). Moreover, the court "failed to state the standard of proof it applied in making the factual determinations required under this subsection in the . . . order or in open court, and we cannot say that the record when viewed in its entirety clearly reveals that the court applied the proper evidentiary standard." *E.M.*, 249 N.C. App. at 56, 790 S.E.2d at 873 (cleaned up).

### E. Ineffective Assistance of Counsel

Respondent-Mother also argues that "[t]o the extent this Court determines there was a waiver of [Respondent-]Mother's constitutional right and parental priority . . . she received ineffective assistance of counsel." However, she also states that "if this Court accepts [Respondent-]Mother's prior arguments to vacate or reverse the [o]rder on the lesser standard, this issue is moot." Because we have determined that the trial court erred by eliminating reunification from the permanent plan and are vacating the court's order on that basis, we do not address this issue.

## IV.    Conclusion

We vacate the trial court's order eliminating reunification from the permanent plan. The issue of whether Respondent-Mother received ineffective assistance of counsel is moot.

VACATED AND REMANDED.

Judges TYSON and HAMPSON concur.

Report per Rule 30(e).